The plaintiffs, alleging that they and their predecessors in title have been the owners since 1883 and in actual possession for more than ten years, of certain lands in Cameron Parish, Louisiana, including Sections 17 to 36, inclusive, in Township 13 South, Range 3 West, filed this suit against the State Mineral Board and the Pure Oil Company, praying for the cancellation, in so far as it affected certain lake and bayou bottoms lying wholly within the boundaries of plaintiffs' land, of a lease granted by the State Mineral Board to the Pure Oil Company.
The State Mineral Board filed exceptions of no cause or right of action which the district court at first sustained but upon rehearing overruled.
The State Mineral Board, in its answer, admitted the execution of the lease to the Pure Oil Company and alleged that there is included in the lease a navigable stream known as Snake Bayou, two navigable lakes known as Snake (or Prehan) Lake and Willow Lake, and an unnamed navigable stream flowing between Snake Bayou and Willow Lake; that all these bodies of water were navigable in 1812 and in 1883, and therefore were "public things" under the laws of the State and insusceptible of private ownership, and that if the petitioners or their authors in title had received *Page 269 
any patents from the State of Louisiana to the area including the lakes and streams mentioned that there was written into those patents by necessary implication a reservation of title in favor of the State of Louisiana to the beds and bottoms of all navigable lakes and streams in the area patented.
The Pure Oil Company answered admitting the plaintiffs' ownership and possession of the lands as a whole and that it had a lease from the State Mineral Board covering the beds of the lakes and streams as well as an overall lease from the plaintiffs, and prayed that judgment be rendered according to the evidence submitted and that the Court definitely decide between the plaintiffs and the State of Louisiana as to the ownership of the beds of the lakes and bayous within the boundaries described in the plaintiffs' petition; and that, should title to any of said beds be held to be vested in the State of Louisiana, the company's leasehold rights under its State lease be recognized.
The plaintiffs filed a plea of prescription under Act No. 62 of 1912, which bars suits to annul patents previously issued by the State unless brought within six years after the effective date of the Act, asserting that the patent, signed by the Governor of the State and the Register of the State Land Office, is valid and regular in every respect; and that any right that the State may have to contest its validity, by asserting title to the beds and bottoms of streams located in the lands covered thereby, has long since been prescribed. *Page 270 
At the trial, the plaintiffs established an unbroken chain of title from the patentee Watkins and the district court found that their title included the area covered by the lake and bayou bottoms in controversy.
The district judge held that the evidence was insufficient toshow that the lakes and bayous in the area were navigable in1883, when the patent to Watkins was issued, but that "* * * In view of the case of Realty Operators, Inc. v. State Mineral Board, 202 La. 398, 12 So.2d 198, and State v. Sweet Lake Land and Oil Co., 164 La. 240, 113 So. 833, I (the district judge) am of the opinion that the question as to whether the lakes and bayous contained in the area patented by Watkins, now owned by the plaintiffs, were or not navigable is immaterial. * * *" (Italics ours.)
Accordingly, judgment was rendered recognizing the claims of the plaintiffs as owners, rejecting the claim of the State Mineral Board, and ordering that the State Lease No. 549 be canceled and erased from the Conveyance Records of Cameron Parish, in so far as it covered any properties or water bottoms contained in the land described in plaintiffs' petition. The rights of the Pure Oil Company as lessee of the plaintiffs were left unaffected by the judgment.
After a stipulation setting the value of the rights in dispute at over $2,000, the defendants asked for and were granted an order of appeal, both suspensive and devolutive, to this Court. No answer to the appeal has been filed. *Page 271 
The State Mineral Board asks for the reversal of the judgment on the ground that these lakes and bayous were navigable and that "Act 62 of 1912 has not been applied against navigable water bottoms."
The appellees contend that the State Mineral Board has no right to assail the Watkins patent collaterally in this suit; that the only navigable body in the area covered by their title was Grand Lake, the title to which was specifically reserved to the State by the terms of the patent; that since the patent contained the clause excluding "that portion of the township lying in Grand Lake", it was evident that other navigable waters, particularly these remote and shallow ones, were not intended to be excluded from the patent "by necessary implication" and that under the doctrine of inclusio unius est exclusio alterius the inclusion of this exception in the grant would exclude other exceptions; and re-urge their plea of prescription under Act No. 62 of 1912.
On the question of collateral attack this Court, in State v. Sweet Lake Land Oil Company, 164 La. 240, 113 So. 833, 838, used the following language: "It is hardly necessary to consider the defendant's plea that the state had no right to assail collaterally, in a petitory action against an innocent transferee holding title from the patentee, the original patents, which are apparently valid. There seems to be no doubt about the proposition that a land patent, if not void on its face, is not only a conveyance of the title for the land, but is in the nature of an official declaration by that department of the government in *Page 272 
which the sale of the public lands is intrusted by law that all of the requirements preliminary to the issue of the patent were complied with, and that declaration, or presumption, is not open to rebuttal in an action at law against an innocent transferee of the title from the patentee. United States v. Reading, 18 How. 1, 16, [59 U.S. 1, 16] 15 L.Ed. 291; United States v. Stone, 2 Wall. 525, 528, [69 U.S. 525, 528]17 L.Ed. 765; St. Louis Smelting Refining Co. v. Kemp, 104 U.S. 635,26 L.Ed. 875; Davis v. Wiebbold, 139 U.S. 507, 11 S.Ct. 628,35 L.Ed. 238. See, also, Lott v. Prudhomme, 3 Rob. 293; Carter v. Monetti, 6 Rob. 82; Scuddy v. Shaffer, 10 La.Ann. 133; Smith v. Crandell, 118 La. 1052, 43 So. 699; Leonard v. Garrett,128 La. 535, 54 So. 984."
Grand Lake, in Cameron Parish, is about ten miles long and from two to ten miles wide. Extending eastward for some six miles from Grand Lake is Mallard Bay, varying in width from one to two miles. Near the Bay's end it narrows to less than one-half mile, to connect with its remote southern arm, which is almost circular in shape and over a mile and a half in diameter. Willow Lake and Snake Lake are both south of this arm of Mallard Bay, are round in shape and appear on the map as a sort of afterthought to this enlarged tip of Mallard Bay. Snake Lake is about one-half mile in diameter and connected to the tip of Mallard Bay, a mile or more away to the north, by Snake Bayou. Willow Lake is half as large and located roughly east of the halfway point of Snake Bayou from which a small unnamed waterway *Page 273 
extends to Willow Lake. Both lakes and Snake Bayou are contained within an area about a mile and a half square, surrounded on all sides by marshes. The entire area of the lakes, bayous and marshes is owned by the plaintiffs. The connections to the remote arm of Mallard Bay are through crooked bayous at a point some five miles from Mallard Bay's entrance to Grand Lake. These dead-end bodies were never destined to be public waterways for commerce or navigation and are of no commercial importance.
The plaintiffs' witness, Mr. Buston, testified that he was familiar with the property, its lakes and bayous for the last 32 or 33 years and that he first went in there hunting with his father about 1911 or 1912; that at that time it was impossible for them to go through Snake Bayou in a 25 foot motor boat because "* * * it was closed with growth, water lilies and so forth"; that Snake Bayou today is much larger than it was then; that it had been cleaned out around 1923 or 1924 and a dam was built across it by the Lake Arthur Club; that the "unnamed bayou" connecting Snake Bayou and Willow Lake is more in the nature of a pirogue run and that when he first knew the place (1923) it had been recently made by extending with shovels, etc., an old alligator run; that it was only lately that barges had gone even as far as Snake Lake; that they entered into Snake Lake through Snake bayou from Mallard Bay and went out the same way; that they had to dredge out Snake Bayou "because it was crooked" before the barges could come in; and that to this day no one can *Page 274 
go into Willow Lake by following any natural water course or channel.
Defense witness, H. M. Hayne, engineer in the Department of Public Works, visited the area in June, 1943. He testified that Snake Bayou was a mile to a mile and a quarter long with five to nine feet of water; that the small bayou going into Willow Lake from Snake Bayou had 3 1/2 feet to 4 feet of water in it; that there was approximately 4 feet of water in Willow Lake itself; that along the last-mentioned small bayou there was evidence of piled up vegetation which he thought was thrown on the bank when this bayou was cleaned out each year; that Snake Bayou, Snake Lake, and Willow Lake were open, Snake Lake covering approximately 198 acres; Willow Lake about 107 acres; and that the total area of the bottoms in controversy, including Snake Bayou, the two Lakes and the unnamed bayou, was about 304 acres; and that the entire area surrounding all the water bodies was marshy; not subject to cultivation and "* * * you can't walk very far on it".
At that time, the Pure Oil Company's dredging off of corners to make Snake Bayou fit for bringing its drilling equipment, barges, etc., into Snake Lake had not started, although the stakes were up. On the day of Mr. Hayne's visit, he did not know whether it was extreme low water, high water, or normal tide. He had not seen the area before or since.
Whether this Snake Bayou, Snake Lake, etc., were navigable or not in 1812 and 1883 cannot be definitely determined from the *Page 275 
record. Since the State Mineral Board's attack on the Watkins patent is barred by prescription, further consideration of the record's meager and inconclusive evidence on past and present navigability of these out-of-the-way waters is unnecessary.
In the case of Realty Operators, Inc. v. State Mineral Board,202 La. 398, 12 So.2d 198, 202, the defendant contended "* * * that the evidence shows that Lake Hatch is a navigable body ofwater and that the judge of the lower court erred in failing toadmit certain evidence touching on the question of navigabilityof the lake which was tendered by the defendants." (Italics ours.) The Supreme Court, in passing upon this contention, said: "The answer to this contention is that the issue of navigability of Lake Hatch is of no importance to the decision in this case because, whether it be navigable or not, defendants' right to question the validity of the patents issued to plaintiff's ancestors in title has been foreclosed by failure to file suit within six years from the passage of Act No. 62 of 1912. See State v. Sweet Lake Land Oil Co.,164 La. 240, 113 So. 833. Assuming, for the sake of argument only, that the lake was navigable in fact in 1812 and that, therefore, the State was the owner of its bed and bottom by virtue of its sovereignty, there was no restraint, constitutional or otherwise, placed upon the State at the time the patents were issued which prevented it from disposing of said bed or bottom by patent to private individuals."
Counsel for the State Mineral Board contend that the holdings in the Realty Operators, Inc. v. State Mineral Board and *Page 276 
State v. Sweet Lake Land Oil Co. cases, supra, conflict with the decision in the case of Miami Corporation v. State,186 La. 784, 173 So. 315, 322.
The Miami Corporation sued the State, asking to be decreed the owner of an eroded area (formerly shore land and to which the Miami Corporation held title) which now forms a part of the bed of Grand Lake in Cameron Parish, La.
The Grand Lake involved is the same lake that was excluded from the patent to Watkins (on which the plaintiffs' title finally rests). That Lake is approximately 10 miles long and 3 to 9 miles wide. The Mermentau River flows into the north end and out of its south end. Consequently, the lake is a large and important commercial waterway.
Through the action of natural forces, subsidence, wind, wave, and current, or the like, there has been a considerable eating away of the shore and a corresponding addition to the bed of the lake. This Court in the Miami case held: "* * * It appears to be the rule that where the forces of nature — subsidence and erosion — have operated on the banks of a navigable body of water, regardless of whether it be a body of fresh water or the sea, or an arm of the sea, the submerged area becomes a portion of the bed and is insusceptible of private ownership."
It is true that the effect of the Miami case is to take title to a portion of the bed of a navigable lake away from an individual and give it to the State, while the decision in the Realty Operators, Inc. v. State Mineral *Page 277 
Board case might accomplish (supposing Lake Hatch was navigable) the reverse result. Nevertheless, these cases are distinguishable.
The Miami case is consistent with the sound public policy on navigable waters as followed in the Constitution of 1921, which specifically forbids the agencies of the State of Louisiana from conveying any future title to the bottoms of navigable waters.
The present case and the State v. Sweet Lake Land Oil Co. and Realty Operators, Inc. v. State Mineral Board cases, supra, represent the limited instances in which the State officers issued patents to unimportant lake and stream beds when there was no constitutional prohibition. In conformity with this State's consistent policy to stabilize real estate titles and discourage continual lawsuits over ancient infirmities of title, the Legislature provided by Act No. 62 of 1912 that the State should attack such patents within the six year prescriptive period therein provided or be forever barred.
In the case now before us, the plaintiffs established an unbroken chain of title back to the State through the Watkins patent; and that the patent covered all the land described in their petition, including the lake and bayou bottoms.
The State Mineral Board had no right to make a collateral attack on this Watkins patent in a proceeding against a remote transferee, and in fact, had lost, through prescription, its right to attack the patent in any action against any party. *Page 278 
For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court be affirmed; the costs of court to be paid one-half by each defendant.
FOURNET, HAMITER, and HAWTHORNE, JJ., concur in the decree.
PONDER, J., concurs.
O'NIELL, C. J., concurs in the decree but adheres to the opinion that the decision in Miami Corporation v. State of Louisiana, 186 La. 784, 173 So. 315, was wrong, and is of the opinion that that decision cannot be reconciled with the decision in Realty Operators, Inc., v. State Mineral Board,202 La. 398, 12 So.2d 198.